**In re Marc COHEN, Debtor.**

**Genesee Court Householders Association, Inc., Plaintiffs,**

v.

**Marc Cohen, Defendant.**

**Bankruptcy No. 01–65784. Adversary No. 01–80197.**

United States Bankruptcy Court, N.D. New York.

May 10, 2002.

---

Gustave J. De Traglia, Jr., Utica, NY, for plaintiffs.

Mark A. Wolber, Utica, NY, for debtor.

Carolyn Cooley, Utica, NY, Chapter 7 Trustee.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

Under consideration by the Court are several matters in the above-referenced case. The first concerns a motion filed by Marc Cohen ("Debtor") by way of Order to Show Cause, dated October 4, 2001, seeking a finding of a violation of the automatic stay pursuant to § 362(h) of the Bankruptcy Code, 11 U.S.C. §§ 101–1330 ("Code") and an award of attorney's fees and damages. The Order to Show Cause required Genesee Court Householders Association, Inc. (the "Association") to restore water service to the condominium unit owned by the Debtor and located at 10 Genesee Court, Utica, New York ("Debtor's Condominium Unit").[1]

On October 9, 2001, at the Court's regular motion term in Binghamton, New York, the Court was apprized that the water had not as yet been restored to the Debtor's Condominium Unit. Accordingly, the Court indicated that the Association would be fined $50 per day, beginning October 4,

---

1. The Order to Show Cause was delivered to the Association's counsel, Gustave DeTraglia ("DeTraglia") on October 4, 2001, by the Debtor. *See* Affidavit of Service, sworn to on October 9, 2001. It was not served on any member of the Association apparently because of instructions to the Debtor that all legal correspondence be directed only to DeTraglia.

2001, until the water was restored, for failure to comply with the Court's Order. At a hearing conducted on October 12, 2001, the Court was informed that the water had been restored on October 9, 2001. At that time, the Court also heard argument on the Debtor's motion pursuant to Code § 362(h) and determined that there had been a willful violation of the automatic stay by the Association in turning off the water to the Debtor's Condominium Unit on September 28, 2001, three days after the Debtor had filed a petition pursuant to chapter 7 of the Code. The Court indicated that it would schedule an evidentiary hearing to address the issue of damages and whether the Association acted with maliciousness and in bad faith when it shut the water off on September 28, 2001.

Originally scheduled to be heard on October 18,2001, a hearing on the Code § 362(h) motion was conducted on December 3, 2001, and continued on January 2, 2002, in Utica, New York. Following the testimony of various witnesses, the Court provided the parties with an opportunity to file memoranda of law. The matter was submitted for decision on January 30, 2002.

In the interim, on December 20, 2001, the Association filed a motion by way of Order to Show Cause in the adversary proceeding it had commenced seeking relief from the automatic stay in order to foreclose on a lien pursuant to § 339(z) of New York Real Property Law ("NYRPL").[2] The Court heard oral argument on the motion on December 20, 2001, in Utica, New York. At that time, the Court expressed some reservations concerning whether or not the Association could seek relief from the automatic stay since it had not perfected its lien as set forth in NYRPL § 339(aa) prepetition. The Court granted an adjournment in order to afford the parties an opportunity to file memoranda of law on the applicability of Code § 546(b). The Association's counsel failed to appear at the adjourned hearing date of January 29, 2002, and had not filed a memorandum of law on behalf of the Association in the adversary proceeding. As a result, the Court denied its motion from the Bench. It was later brought to the Court's attention that a memorandum of law had been timely filed on behalf of the Association but improperly captioned in the case, not in the adversary proceeding. By letter dated February 8, 2002, the Court indicated that it would again consider the motion at its motion calendar in Utica, New York, on February 26, 2002. At that time the Court agreed to issue a written decision.

The Association in its Complaint seeks the denial of the Debtor's discharge pursuant to Code § 727 based on allegations that the Debtor failed to list his interest in real property known as 172 Ridge Road, Utica, New York ("Ridge Road property"), occupied by his father, as well as his interest in a trust. The Association also requests a determination of nondischargeability of the debt owed to it pursuant to Code § 523(a)(6) based on allegations of willful injury to its property for which a judgment was obtained against the Debtor in state court prior to the bankruptcy. In its Complaint, the Association also objects to the Debtor's claim of a homestead exemption in the amount of $9,500, which the

---

**2.** The Association filed a complaint ("Complaint") on December 10, 2001, and a summons was issued on December 11, 2001. According to the Affidavit of Service, filed on January 2, 2002, the summons and complaint were not served on the Debtor until December 27, 2001. Debtor filed an answer on January 14, 2002, and, *inter alia,* objected to the timeliness of the service on him.

Debtor listed as the value of his Condominium Unit.

A trial of the adversary proceeding was conducted on April 15, 2002, in Utica, New York. At the close of the Association/Plaintiff's proof, Debtor's counsel moved to dismiss the complaint. The Court agreed with Debtor's counsel that the Association had failed to meet its burden of proof with respect to Code § 727 and § 523(a)(6). Accordingly, the Court dismissed both causes· of action and indicated that the only cause of action with any possible validity was the Association's objection to the Debtor's claim of an exemption of $9,500, the value he placed on his Condominium Unit. The Court indicated that it would issue a single written decision addressing all three matters under submission.

### JURISDICTIONAL STATEMENT

The Court has jurisdiction over the parties and subject matter of this adversary proceeding and contested matters pursuant to 28 U.S.C. §§ 1334(b), 157(a), 157(b)(1), (b)(2)(B), (G), (I), (J), (K) and (O).

### FACTS

The Debtor filed a voluntary petition pursuant to chapter 7 of the Code on September 25, 2001. In his schedules, the Debtor lists ownership in the Condominium Unit, which he indicates has a value of $9,500. See Schedule A. He also lists a 1/3 residuary interest in the Ridge Road property, subject to the life estate of his father. See id. He values his 1/3 interest in the Ridge Road property at "0." Id. He claims a homestead exemption of $9,500 in the Condominium Unit. See Schedule C. The only creditor listed in his schedules is the Association. See Schedule F. He lists an unsecured claim of $1,750 pursuant to a judgment issued by the Utica City Court on February 4, 2000 for damage to a door in 1999.[3] He also lists a judgment issued on September 11, 2000, in the amount of $105, which he identifies as an "assessment for painting." Finally, he lists a claim of $6,400 for "1999–2001 assessments [for] parking fees, water, Niagara Mohawk, attorney's fees, damage."

At the evidentiary hearing held in connection with the Code § 362(h) motion, the Debtor testified on January 2, 2002, that he had lived in the Condominium Unit for approximately seven years and that approximately three years ago he had noted that certain members of the Board of Directors/Managers ("Board") were not paying what he considered to be their fair share of the parking charges. As a result, he notified the Board that he was withholding the monthly parking assessment from his payment and sent in the balance of the amount due. He testified that in approximately December 2000 the Board refused to accept reduced payments from him and informed him that he was no longer entitled to maintenance services. On or about July 29, 2001, he allegedly received a letter threatening to shut his water off. Ultimately, his water was shut off on August 11, 2001, by means of a bypass around his unit installed by H.M. Williams Heating, Inc. at the request of the Board. Debtor testified that on or about August 16, 2001, he obtained an injunction from the Hon. Norman Siegel, Justice, New York State Supreme Court, Oneida County, ordering that the water be turned back on. Justice Siegel scheduled a hearing for September 27, 2001, which was then adjourned to September 28, 2001, at which time the Association was to pres-

---

**3.** In his Statement of Financial Affairs, he indicates a judgment date of February 4, 2001.

ent an accounting of the amount alleged to be owed by the Debtor. Water service was restored on the morning of August 17, 2001, between 5:00 a.m. and 7:00 a.m. In the interim, the Association sought by way of Order to Show Cause, dated September 17, 2001, permission to enforce a judgment by allowing the sale of the Debtor's Condominium Unit. The matter was scheduled to be heard on September 26, 2001, before the Hon. Anthony F. Shaheen, Justice, New York State Supreme Court, Oneida County. Both matters in state court were allegedly stayed upon notification of the Debtor's bankruptcy.

The Debtor testified that on September 25, 2001, he served a copy of his petition on DeTraglia. The Notice to Creditors, scheduling the meeting of creditors pursuant to Code § 341 for October 18, 2001,[4] was mailed to the Association on September 28, 2001. Roy Bouse ("Bouse"), a member of the Association and officer of its Board, testified that he generally picked up the mail addressed to the Association on a weekly basis. It was his testimony that he had actually learned of the Debtor's bankruptcy either on the evening of September 28, 2001, or the morning of September 29th from Timothy Trent ("Trent"), another member of the Association's Board. On September 28, 2001, the water to the Debtor's Condominium Unit was again shut off. Bouse testified that it was turned off by Thomas Lyness ("Lyness"), the maintenance man for the Association, at the direction of the Board. Bouse could not recall whether a formal Board meeting was held approving the action. He assumed that it had occurred at the direction of the Board president, Richard Montero ("Montero").

Bouse testified that he viewed Justice Siegel's order of August 16, 2001, which required that the water be turned back on, to have expired on September 28, 2001, when the hearing was cancelled. As he expressed it, the Association was "back to square one" when the meeting with Justice Siegel was cancelled.

Bouse testified that Montero had conferred with him before directing Lyness to turn the water back off. He did not believe anyone had consulted with DeTraglia before taking this step. Montero confirmed Bouse's testimony, indicating that he had directed that the water be shut off following "an informal Board meeting." Trent testified that because the Debtor had not made the payments as ordered by Justice Siegel and nothing had been resolved when the hearing before Justice Siegel for September 28, 2001, had been canceled, he did not raise any objections to the water being shut off again.

As noted previously, on October 4, 2001, this Court issued an Order to Show Cause requiring the Association to restore water service to the Debtor's Condominium Unit, which was served on DeTraglia. According to the Debtor, he encountered Trent on October 4th and informed him that the water was to be restored. He testified that Trent told him that all matters involving Cohen were to be handled by DeTraglia's office because of all the "legal stuff."[5] Trent testified that DeTraglia called him around noon on October 4th and informed

---

**4.** According to the case file, the meeting was concluded on November 1, 2001.

**5.** There was testimony that all correspondence from the Debtor and addressed to the Association was to be forwarded to DeTraglia for response. Debtor testified that he continued to send adjusted payments to the Associa-

tion each month, which they refused to accept and were apparently returned to him by DeTraglia. Bouse testified that the Debtor had been given notice that he should correspond directly with DeTraglia on any matters involving the Association.

him of the Court's Order. Trent indicated that he called Bouse within an hour and left a message for him and also called him on his cellular phone. He further explained that Lyness had been directed only to perform work for the Association at the request of either Montero or Bouse. Therefore, since he was not authorized to direct Lyness to turn the water back on, Trent called Bouse and assumed Bouse or Montero would contact Lyness.

It was Bouse's testimony that the Board "conferred" but did not formally meet. He spoke with Trent on Thursday, October 4th, and indicated that he would let Montero know. He worked until approximately 8:00 p.m. on October 5th and did not speak to Montero until 8:30 or 9:00 p.m. on Saturday, October 6th. Bouse testified that he had called Antoinette Fanelli on Friday morning, October 5th, before leaving for work to inquire whether she had seen Lyness and asked that she have Lyness call him if she did see him. Bouse also indicated that he left a message for Lyness asking that he get in touch with him. Montero testified that he also called Lyness and left 2–3 messages for him. He did not call Martin Williams of H.M. Williams Heating, Inc. ("Williams")because it was a holiday weekend and he believed that the occupant in Unit 8, Beverly Quist ("Quist"), was not home to allow anyone access to her basement where the valve was located to turn the hot water back on in the Debtor's Condominium Unit. The Debtor testified that he observed Quist's car in the parking lot between October 6th and October 8th.

Williams, who had rerouted the water pipes around the Debtor's Condominium Unit in August 2001, testified that he had two employees working at the Condominium on Friday, October 5, 2001, between 7:45 a.m. and 2:00 p.m. It was his testimony that no one had requested that he reconnect the water service to the Debtor's Condominium Unit.

At the hearing, it was pointed out that October 8th was a holiday. Bouse testified that he did not know whether Quist was home between October 5th and October 8th. As noted above, the parties appeared before this Court on Tuesday, October 9, 2001, and acknowledged that the Debtor's water service had not as yet been restored.

At the adjourned evidentiary hearing of January 2, 2002, Quist testified that she recalled being asked by Bouse and Montero for permission to access her basement in order to shut off the water to the Debtor's Condominium Unit in August 2001. She understood that as officers of the Board, they made their request on the Board's recommendation. She also knew that at some point the water had been turned back on. She could not recall anyone asking her for access to her basement between October 4th and October 9th. She testified that on Friday, October 5th, she would have been at work, returning home between 5:30 and 6:30 p.m. While she testified that there were several weekends in October when she was away attending conferences, she could not recall taking off for a three day weekend in the fall and she had no holidays in October. She also could not recall whether she was home between October 5th and October 8th. She testified that she does have voice mail at her place of employment but could not recall any calls asking her for access to the basement in her unit on October 9th.

The Debtor testified that after the water was shut off to his Condominium Unit on September 28, 2001, he was able to restore the cold water by turning on the valve in Unit 12. Without hot water, he was not able to wash dishes or take showers. He was able to take hot showers at the Ridge Road property.

At the trial of the adversary proceeding on April 15, 2002, the Court heard testimony from Frank Donato ("Donato"), a certified appraiser, who appraised the Debtor's Condominium Unit, Unit 10. According to the appraisal, dated March 28, 2002, the market value of the Debtor's Condominium Unit was estimated to be $17,000 as of November 7, 2001. *See* Association/Plaintiff's Exhibit 1. Donato described the units in the complex as average with a single heating unit servicing the entire complex. He explained that the townhouse complex had been built approximately 85 years ago and at that time all units were two-story, one-family dwellings. Over the years, some had been converted to two apartments, each level consisting of a living room, kitchen, bedroom and bath. *See id.* at 8.

In order to determine market value of the Debtor's Condominium Unit, Donato examined several other units in the complex, explaining that there were no other similar comparables in Utica, New York. Without having seen the interior of the Debtor's Condominium Unit, he estimated the market value to be $17,000.

He based his estimate primarily on three comparables [6]: (1) Unit 11 had been sold for $15,000 in 1996.(2) Unit 16 had been sold to Bouse in 1995 for $10,000, was comprised of two apartments like the Debtor's unit, but was larger in size to that of the Debtor; (3) Unit 19 had been sold in 1995 for $23,500 and consisted of a one-family unit with three bedrooms. One unit (identified in the appraisal as also being Unit 19 but testified to as Unit 4) was currently on the market for $28,000. Donato had not gone into Unit 10 (Debtor's Unit) or Unit 19 and had not found it necessary to make any adjustments since both were of the same square footage. He

did acknowledge that as a general rule, depending on the type of floor coverings, the value of a property could be impacted by between $2,000 and $3,000, and a completely remodeled kitchen could increase the value of property by as much as $4,000 to $5,000 when compared to other similar properties. For purposes of his appraisal, he assumed all of the units to be in average condition. Donato testified that since 1995 there had been a decrease in the value of real property in the Utica area, which was only now starting to recover. He also acknowledged that he was aware of at least one unit in the complex that had been on the market for more than five years. He did not know what offers had been made on it during that time. He also did not know how long Unit 4 had been on the market but noted that it was similar to the Debtor's Unit 10 in that it had an apartment on each of the two levels. According to his appraisal, the marketing time "based on sales of similar properties, is considered to be 15–24 months. This marketing time is longer than normal due to the subject's design and location." *See* Association/Plaintiff's Exhibit 1 at 10.

## DISCUSSION

*Objection to Debtor's Claim of a Homestead Exemption*

██ The Association filed its Complaint on December 10, 2001. The Summons issued on December 11, 2001, was served on the Debtor, along with a copy of the Complaint, on December 27, 2001, or sixteen days after its issuance. Rule 7004(e) of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P.") requires that service of the summons and complaint be made within 10 days after the summons

---

6. Unit 18 had been sold in 2001 for $6,000 but was not included in the comparison because it was a tax sale and not viewed as an arm's length transaction.

is issued.[7] A party is expected to be familiar with the rules of procedure and it was incumbent upon the Association/Plaintiff to correct the error in service. The Debtor had no obligation to inform his adversary of the noncompliance with the procedural rules. The Debtor did raise an objection to the timeliness of the service in his Answer, filed January 14, 2002. However, it is not clear whether the Debtor actually served the Association or its attorney, DeTraglia, with a copy of his Answer. Nonetheless, the fact is that the Debtor was under no obligation to respond to the Complaint pursuant to Rule 12(a) of the Federal Rules of Civil Procedure ("Fed.R.Civ. P."), as incorporated by reference in Fed. R.Bankr.P. 7012, because of the invalidity of the summons at the time it was served on him. *See In re Johannsen*, 82 B.R. 547, 548–49 (Bankr.D.Mont.1988). There is no evidence that any summons was reissued and served within the 120 day period set forth in Fed.R.Civ.P. 4(c)(1), made applicable to adversary proceedings pursuant to Fed.R.Bankr.P. 7004(a). Fed.R.Civ.P. 4(m), also made applicable to adversary proceedings pursuant to Fed.R.Bankr.P 7004(a), provides for dismissal of the complaint after notice to a plaintiff in order to afford a plaintiff the opportunity to show good cause for the failure to serve the summons and complaint.

In this case, the Association/Plaintiff was not given any notice pursuant to Fed. R.Civ.P. 4(m) that the Court intended to dismiss its Complaint on the grounds that the service of process had not been timely in order that it might have an opportunity to establish that there was good cause for its failure to serve the Debtor with a valid summons within the 120 day period.

Nonetheless, the Court has alternative grounds for dismissing the Complaint insofar as the Association/Plaintiff objects to the Debtor's claim of his homestead exemption.

■ Fed.R.Bankr.P. 4003(b) requires that "[a] party in interest may file an objection to the list of property claimed as exempt within 30 days after the meeting of creditors held under § 341 is concluded. . . ." The Court is permitted to extend the time for cause if before the time expires a party in interest files a request for an extension. In this case, the original date for the § 341 meeting was October 18, 2001. It was concluded on November 1, 2001. Accordingly, the commencement of the adversary proceeding on December 10, 2001, to the extent that it asserted an objection to the Debtor's claim of an exemption in his homestead, was untimely. Therefore, the Court concludes that the Association/Plaintiff's Complaint should be dismissed, its objection to the Debtor's claim of a homestead objection being the only cause of action which survived the Debtor's motion addressed to the proof presented at trial on April 15, 2002.

*Motion for Relief from the Stay to Perfect its Lien and Foreclose on the Debtor's Condominium Unit*

■ The Association seeks relief from the automatic stay to proceed with foreclosure of its lien on Debtor's Condominium Unit. NYRPL § 339–z, *inter alia*, provides that

> [t]he board of managers, on behalf of the unit owners, shall have a lien on each unit for the unpaid common charges thereof, together with the interest thereon, prior to all other liens except only (i)

---

7. After ten days of its issuance, the summons is invalid. "This is because, under the Federal Rules of Bankruptcy Procedure, the time for a defendant to answer is calculated from the date of issuance of the summons, rather than from the date of service." *In re Goforth*, 183 B.R. 560, 561 n. 1 (Bankr.W.D.Ark.1995).

liens for taxes on the unit in favor of any assessing unit, school district, special district, county or other taxing unit, (ii) all sums unpaid on a first mortgage of record ... Upon the sale or conveyance of a unit, such unpaid common charges shall be paid out of the sale proceeds or by the grantee.

NYRPL § 339–z (McKinney's 2001–2002 Supp.).

NYRPL § 339–aa states that

[t]he lien provided for in the immediately preceding section shall be effective from and after the filing in the office of the recording officer in which the declaration is filed a verified notice of lien ... and shall continue in effect until all sums secured thereby, with the interest thereon, shall have been fully paid or until expiration six years from the date of filing, whichever occurs sooner....

NYRPL § 339–aa (McKinney's 2001–2002 Supp.).

■ At the time the Debtor filed his petition, the Association had not perfected its lien by filing a verified notice of lien. Unless its lien is perfected, it is not enforceable and subject to avoidance by the trustee. Under those circumstances, as an unsecured creditor, the Association would not be entitled to relief from the automatic stay. The question before this Court is whether the automatic stay provided for in Code § 362 prevents the Association from filing the notice of lien referenced in NYRPL § 339–aa postpetition. Code § 362(b)(3) creates an exception to the automatic stay for "any act to perfect ... an interest in property to the extent that the trustee's rights and powers are subject to such perfection under § 546(b) of the title...." 11 U.S.C. § 362(b)(3).

Code § 546(b)(1)(A) provides that

[t]he rights and powers of a trustee under sections 544, 545, and 549 of this title are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection ...

11 U.S.C. § 546(b)(1)(A)

In *In re Maas,* 69 B.R. 245 (Bankr. M.D.Fla.1986), the condominium association recorded a claim of lien postpetition with respect to pre-petition maintenance and special assessments. Chief Bankruptcy Judge Alexander L. Paskay examined the Code sections referenced above and determined that Code § 362(b)(3) and § 546(b)

provide a limited exception to the automatic stay. These sections provide that the post-petition recordation (perfection) of a lien against property of the debtor is not a violation of the automatic stay, if, pursuant to applicable non-bankruptcy law, the lien relates back to a time pre-petition and would defeat the rights of a hypothetical lien creditor which is granted to the Trustee by § 544.

*Id.,* at 246–47. He concluded that the filing of the lien had no retroactive effect under applicable Florida law and, therefore, the postpetition recording of the lien by the association violated the automatic stay because the lien would not defeat a judicial lien of a hypothetical creditor. *Id.* at 247.

Under the facts of the case now before this Court, at the time the Debtor filed his petition, the Association's lien for the 1999–2001 was of no force and effect because it had not filed a notice of lien as required by NYRPL § 339–aa. *See In re Mishkin,* 85 B.R. 18, 23 (Bankr.S.D.N.Y. 1988). The question before the Court is whether Code § 546(b) has any application under those circumstances.

The first requirement in the application of Code § 546(b) is that the state law be a "generally applicable law." Neither NYRPL § 339–z nor § 339–aa singles out individuals that have sought the protection of the Bankruptcy Code. Therefore, it is a "generally applicable law." *See In re Microfab, Inc.*, 105 B.R. 152, 156–57 (Bankr. D.Mass.1989).

With respect to the second requirement, NYRPL § 339–aa permits the perfection of an interest in property. The Code defines "lien" as a charge against or interest in property to secure payment of a debt or performance of an obligation. 11 U.S.C. § 101(37). As noted by the court in *Microfab*, "[t]o perfect a lien or other security interest is to satisfy all conditions necessary to make the lien effective against third parties and, in the case of a statutory, non-consensual lien, against the property owner." *Microfab*, 105 B.R. at 157. NYRPL § 339–aa sets out the procedure for filing a notice of lien whereby it is made effective "from and after the filing in the office of the recording officer …" NYRPL § 339–aa (McKinney's 2001–2002 Supp.)

The more difficult issue involves the third requirement of Code § 546(b), namely that the perfection permitted by the generally applicable law "be effective against an entity that acquires rights in such property before the date of such perfection." Pursuant to Code § 545(2) the Code allows a trustee to avoid a statutory lien on property of the debtor to the extent that such lien "is not perfected or enforceable at the time of the commencement of the case against a bona fide purchaser that purchases such property, whether or not such a purchaser exists." 11 U.S.C. § 545(2). However, as noted by the court in *Microfab,*

§ 546(b) does not focus on the date the lien becomes effective. It asks whether the lien, once perfected, takes priority over interests in the property that were perfected before the Commonwealth's lien was perfected. If it does, then the trustee in bankruptcy may not avoid it.

*Microfab*, 105 B.R. at 157 (citation omitted).

Pursuant to NYRPL § 339–z, the lien created pursuant to NYRPL § 339–aa is given priority over all other liens except those for municipal/school taxes and those of the first mortgagee. In addition, in the event of a sale of a condominium unit, "unpaid common charges shall be paid out of the sale proceeds or by the grantee." Thus, the perfection is effective against the trustee standing in the shoes of a bona fide purchaser even if filed after the date of the petition, the date by which the trustee's status and avoidance powers is measured. The general rule that normally governs the priority of liens, "first in time, first in right" does not apply by virtue of NYRPL § 339–z.

Thus, the Association can perfect its lien without violating the automatic stay pursuant to Code § 362(b)(3). This conclusion comports with the intent of the state legislature, namely "that of ensuring the continued viability of the entire condominium project and protecting those who have invested substantial sums of their life savings from unit owners who have failed to pay their common charges." *Washington Federal Savings and Loan Association v. Schneider*, 95 Misc.2d 924, 929, 408 N.Y.S.2d 588 (N.Y.Sup.1978). At such time as the Association files its verified notice of lien and complies with the requirements of NYRPL § 339–aa, it shall be entitled to renew its motion before this Court with respect to seeking relief from the automatic stay to foreclose on its lien

pursuant to Code § 362(d)(1).[8]

*Award of Attorney's Fees and Damages pursuant to Code § 362(h) and Sanctions*

■ The Court previously found a willful violation of the automatic stay by the Association as a result of its termination of the Debtor's water on September 28, 2001. The Court also awarded sanctions of $50 per day as a result of the Association's failure to timely comply with its Order of October 4, 2001, requiring that the Debtor's water be restored. At the evidentiary hearings on December 3, 2001, and January 2, 2002, the parties were provided an opportunity to present the Court with the circumstances surrounding the termination of the water to the Debtor's Condominium Unit on September 28, 2001, and the delay in restoring the water until October 9, 2001, as well as to provide proof regarding damages.

The testimony from members of the Association, including the Board members, confirms that DeTraglia informed at least one of the Board members of the Debtor's bankruptcy filing on either September 28, 2001, or September 29, 2001. Upon learning that the state court proceedings were not going to go forward due to the bankruptcy, it appears there was a consensus among the Board members that the Debtor's water should again be turned off on September 28, 2001. They made no attempt to seek the advice of counsel before shutting it off and by their actions totally ignored the protections afforded to the Debtor by means of the automatic stay.

The Association's willful violation of the automatic stay entitles the Debtor to recover costs and attorney's fees pursuant to Code § 362(h). The Debtor testified that he was able to restore cold water to his condominium by accessing Unit 12. He was inconvenienced for a period of eleven days, between September 28, 2001 and October 9, 2001, as he had no hot water with which to shower or clean his dishes. He testified that he did not incur expenses by checking into a hotel during that time, which he had previously done in August 2001; instead, he used the hot water available to him at the Ridge Road property. In this regard, the Court determines it reasonable to order reimbursement of $20 per day or $220 to reimburse the Debtor for his travel and inconvenience and interference in his enjoyment of his properly.

By way of affirmation dated January 4, 2002 ("Wolber's Affirmation"), Debtor's counsel has submitted a request for attorney's fees, covering 19 1/4 hours in services rendered between October 2, 2001, and January 2, 2002, at an hourly rate of $150.[9] In addition, the Debtor testified that he had expended $180 in connection with the service of nine subpoenas at $20 per subpoena and the payment of $135 in witness fees (nine witnesses @ $15 per witness). *See* Attachment to Wolber's Affirmation. Accordingly, the Court awards the Debtor $3,422.50 in costs and attorney's fees as follows:

| | |
|---|---|
| Inconvenience of not having hot water for 11 days | $ 220.00 |
| Attorney's Fees | 2,887.50 |
| Service of Subpoenas | 180.00 |
| Witness fees | 135.00 |
| TOTAL | $3,422.50 |

The Court concludes that the Association, with the exception of the Debtor, is liable

---

**8.** At the trial, the Association presented evidence that the Debtor's Condominium Unit had a market value of $17,000 and that he owed approximately $10,475.94. Accordingly, it would appear that the Debtor has equity in the property making Code § 362(d)(2) inapplicable.

**9.** It is not clear whether the affirmation was served on the Association's counsel. If not, then the Association should have an opportunity to address the reasonableness of such fees.

for the payment of this amount to the Debtor within 30 days of the date of this Order.[10]

Under the circumstances, the Court does not believe an award of punitive damages is warranted. In making a determination of whether the Association's violation of the automatic stay was malicious and in bad faith, the courts generally consider (1) nature of the creditor's conduct, (2) nature and extent of harm to the debtor, (3) the creditor's ability to pay, (4) motives of the creditor, and (5) any provocation by the debtor. *See In re Shade*, 261 B.R. 213, 216 (Bankr.C.D.Ill.2001) (citations omitted). It is evident from the facts that the Board was frustrated with its inability to recover the monies owed by the Debtor. Like the Debtor who unilaterally withheld monies from the Association because in his view he was not receiving certain services, the Board unilaterally withheld water service to the Debtor's Condominium Unit because he was not paying for that service. According to the Debtor's own testimony, his damage was more a matter of inconvenience than anything else. He lives alone, did not find it necessary to find alternative living arrangements and had access to hot water at his father's residence. As far as the Association's ability to pay, it is also clear that the imposition of damages in excess of $3,400, to be shared by other occupants of the complex for actions taken by the Board will serve as sufficient "punishment" without the need for an award of punitive damages.[11] Certainly, the Court is not

giving its stamp of approval to the steps taken by the Association; however, it does not believe the actions warrant an additional award of punitive damages.

The Court, on October 9, 2001, also ordered the Association to pay what amounted to $250 in sanctions as a result of the Association's failure to comply with the Court's Order of October 4, 2001. While the Order of sanctions was made from the Bench without notice to the Association and an opportunity to establish whether diligent efforts had been made to comply with the Order, based on the testimony presented, the Court finds no basis to vacate its prior oral Order. DeTraglia apprized at least one member of the Board of the Court's Order. Williams' employees were present on the grounds of the complex on October 5, 2001, yet no request was made to have the water turned back on. There was also a delay in contacting Lyness until the evening of October 5th or the evening of October 6th. Quist testified that she could not recall having been away that weekend, and the Debtor testified that her car was in the parking lot at least part of that weekend. The Order was issued on Thursday morning, October 4, 2001, and it was not until the following Tuesday, after a hearing in this Court, that an effort was made to comply. This Court's authority to issue orders in connection with cases subject to its jurisdiction is not to be ignored or taken lightly. The Court concludes that the award of sanctions in the amount of $50 per day

---

**10.** This will afford the Association's counsel an opportunity to object to the reasonableness of the attorney's fees if he was not served with a copy of the Wolber Affirmation previously.

**11.** The testimony of the Board members, including Bouse, Trent, Montero and Fanelli, indicates that there was no formal meeting called to determine what action to take with respect to the Debtor on or about September

28, 2001. It was also evident from the testimony that ill-will existed on both sides. Nevertheless, the actions taken by the Board appear to have been taken on behalf of the entire Association. Whether the Board acted within its authority under the bylaws and whether the action was taken in good faith to further a legitimate interest of the condominium is not for this Court to decide.

from October 4, 2001, until the Debtor's hot water was restored on October 9, 2001, was, indeed, warranted.

Based on the foregoing, it is hereby

ORDERED that the Debtor's motion seeking dismissal of the Association's Complaint is granted;

ORDERED that the Association's motion seeking relief from the stay to foreclose on the Debtor's Condominium Unit is denied without prejudice;

ORDERED that pursuant to Code § 362(b)(3) and Code § 546(b), the automatic stay does not preclude the filing of a verified notice of lien by the Association pursuant to NYRPL § 339–aa;

ORDERED that pursuant to Code § 362(h) the Association, within 30 days from the date of this Order, shall pay the Debtor $3,422.50 in actual damages and costs, as well as attorney's fees;[12] and it is finally

ORDERED that the Association, within 30 days from the date of this Order, shall pay Richard Zeh, Clerk, U.S. Bankruptcy Court of the Northern District of New York, 10 Broad Street, Utica, N.Y. 13501, $250 for its failure to comply with this Court's Order of October 4, 2001, until October 9, 2001.

---

**12.** The Association is precluded from assessing the Debtor for the damages awarded herein, including both the award of $3,422.50 and the award of $250.